# UNITED STATES DISTRICT COURT

for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO<br>EMAIL ACCOUNTS THAT ARE STORED AT<br>PREMISES CONTROLLED BY MICROSOFT | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  MJ20-206 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the     Western     District of     Washington    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958     Murder for Hire | |

The application is based on these facts:

✓   See Affidavit of Allana Kleinosky, continued on the attached sheet.

☐   Delayed notice of     days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Allana Kleinosky, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 4/23/20

*Judge's signature*

City and state:   Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

STATE OF WASHINGTON      )
                                 )      ss
COUNTY OF KING           )

I, Allana Kleinosky, having been duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2019.  I am currently assigned to the violent crime, gang, and transnational organized crime squad in the Seattle, Washington office.  As an FBI Special Agent, I have been trained to investigate a variety of crimes, including cases involving federal criminal violations related to violent crimes, illegal drug sales and distribution, gang related criminal activities, and special jurisdiction matters. In this capacity, I investigate, *inter alia,* violations of Title 18 and 21 of the United States Code.

2.      Prior to my role as a Special Agent for the FBI, I was an Air Marshal with the Federal Air Marshal Service for three years and a Customs and Border Protection Officer with Customs and Border Protection for three and a half years.  During my time as a Customs and Border Protection Officer and Federal Air Marshal, I participated in several arrests, seizures, and other law enforcement actions.  I have conducted hundreds of interviews, have taken law enforcement action, and made law enforcement determinations based on the facts I gathered from these interviews.

3.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Microsoft Corporation ("Microsoft"), located at 1 Microsoft Way in Redmond, Washington, and Grays Harbor College, located at 1620 Edward P. Smith Drive in Aberdeen, Washington (collectively, "**THE PROVIDERS**").  The information to be searched is described in the following paragraphs and in Attachments A-1 and A-2.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 1
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

4.      This affidavit is made in support of an application for a search warrant pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require **THE PROVIDERS** to disclose to the government copies of the information, including the content of communications, further described in Section I of Attachments B-1 and B-2, pertaining to the following accounts:

a.   lfigueroa@my.ghc.edu ("**SUBJECT ACCOUNT 1**");

b.   prinhces_latina07@hotmail.com ("**SUBJECT ACCOUNT 2**"); and

c.   lluvia_selene07@hotmail.com ("**SUBJECT ACCOUNT 3**"); (hereinafter, collectively the "**SUBJECT ACCOUNTS**").  Upon receipt of the information described in Section I of Attachments B-1 and B-2, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 and B-2.  This warrant is requested in connection with an ongoing investigation in this district by the FBI.

5.      The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1958 (Murder for Hire) have been committed by LLUVIA FIGUEROA. Section 1958 prohibits "us[ing] or caus[ing] another . . . to use . . . any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 2
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  laws of any State or the United States as consideration for the receipt of, or as

2  consideration for a promise or agreement to pay, anything of pecuniary value" or

3  conspiring to do the same.  There is also probable cause to search the information

4  described in Attachments A-1 and A-2, for evidence, instrumentalities, or contraband of

5  these crimes, as described in Attachments B-1 and B-2.

6       **7.**    This warrant application is to be presented electronically pursuant to Local

7  Criminal Rule CrR 41(d)(3).

8            **<u>BACKGROUND ON CRYPTOCURRENCY</u>**

9      **8.**    Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer,

10  network-based medium of value or exchange that may be used as a substitute for fiat

11  currency to buy goods or services or exchanged for fiat currency or other

12  cryptocurrencies.  Cryptocurrency can exist digitally on the Internet, in an electronic

13  storage device, or in cloud-based servers.  Although not usually stored in any physical

14  form, public and private keys (described below) used to transfer cryptocurrency from one

15  person or place to another can be printed or written on a piece of paper or other tangible

16  object.  Cryptocurrency can be exchanged directly person to person, through a

17  cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is

18  not issued by any government, bank, or company; it is instead generated and controlled

19  through computer software operating on a decentralized peer-to-peer network.  Most

20  cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the

21  decentralized network, containing an immutable and historical record of every

22  transaction.[1]  Cryptocurrency is not illegal in the United States.

23      **9.**    Bitcoin[2] is a type of cryptocurrency.  Payments or transfers of value made

24  with bitcoins are recorded in the Bitcoin blockchain and thus are not maintained by any

---

[1] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

[2] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 3
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

single administrator or entity.  As mentioned above, individuals can acquire bitcoins through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by "mining."  An individual can "mine" bitcoins by using his/her computing power to solve a complicated algorithm and verify and record payments on the blockchain.  Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones.

10.  Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers.  If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.  And while it is not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.

11.  Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key (or public address) is akin to a bank account number, and a private key (or private address) is akin to a Personal Identification Number ("PIN") number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public key and the private key.

---

community, and "bitcoin" (with a lowercase letter b) or "BTC" to label units of the cryptocurrency.  That practice is adopted here.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 4
USAO# 2020R00187

A public address is represented as a case-sensitive string of letters and numbers.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address.  Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

12.     Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services on hidden services websites operating on the Tor network.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces.

13.     Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including: on a tangible, external device ("hardware wallet"); downloaded on a Personal Computer ("PC") or laptop ("desktop wallet"); with an Internet-based cloud storage provider ("online wallet"); as a mobile application on a smartphone or tablet ("mobile wallet"); as printed public and private keys ("paper wallet"); and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a Universal Serial Bus ("USB") thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets may contain an address and a QR code[3] with the public and private key embedded in the code.   Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts,

---

[3] A QR code is a matrix barcode that is a machine-readable optical label.

1  USB drives, or CDs, and accessed through a "recovery seed" (random words strung
2  together in a phrase) or a complex password.  Additional security safeguards for
3  cryptocurrency wallets can include two-factor authorization (such as a password and a
4  phrase).

**BACKGROUND CONCERNING THE DARK NET**

5
6      14.     The "dark net" or "dark web" is a portion of the "Deep Web" of the
7  Internet, where individuals must use anonymizing software or applications to access
8  content and websites.  Within the dark web, criminal marketplaces operate, allowing
9  individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous
10 materials, with greater anonymity than is possible on the traditional Internet (sometimes
11 called the "clear web" or simply the "web").  These online market websites use a variety
12 of technologies, including the Tor network (defined below) and other encryption
13 technologies, to ensure that communications and transactions are shielded from
14 interception and monitoring.  Famous dark web marketplaces, also called Hidden
15 Services, such as Silk Road, AlphaBay,[4] and Dream Market[5] operated similarly to clear
16 web commercial websites such as Amazon and eBay, but offered illicit goods and
17 services.  There are a number of marketplaces that have appeared on the dark web that
18 have offered contraband for sale, including narcotics.  Users typically purchase narcotics
19 through these marketplaces using digital currency such as bitcoin.

20     15.     "Vendors" are the dark web's sellers of goods and services, often of an
21 illicit nature, and they do so through the creation and operation of "vendor accounts" on
22 dark web marketplaces.  Customers, meanwhile, operate "customer accounts."  Vendor
23 and customer accounts are not identified by numbers, but rather monikers or "handles,"

24
25

---

26 [4] AlphaBay was a website on the dark web that offered drugs and other contraband for sale.
   Furthermore, I know that AlphaBay was seized by U.S. law enforcement in July 2017.
27 [5] Dream Market was a website on the dark web that offered drugs and other contraband for sale.
   In late March 2019, Dream Market announced it was closing on April 30, 2019 and transferring
28 its services to a partner company.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 6
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

much like the username one would use on a clear web site.  If a moniker on a particular marketplace has not already been registered by another user, vendors and customers can use the same moniker across multiple marketplaces.  Based on customer reviews, vendors can become well known as "trusted" vendors.

16.     The Onion Router or "Tor" network is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and thereby the locations and identities of the network's users.  Tor likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network. Such "hidden services" operating on Tor have complex web addresses, which are many times generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software designed to access the Tor network.  Most "hidden services" are considered dark web services with no legitimate or identified service provider to which legal process may be served.

## STATEMENT OF PROBABLE CAUSE

**A.     Summary of Investigation**

17.     On February 12, 2020, the FBI received an anonymous tip from an individual ("SOI-1") purporting to operate a website on the dark web that offers hitmen for hire.  SOI-1 claimed to have received a request to murder a woman who resides in Bellevue, Washington ("VICTIM").  SOI-1 stated that, although SOI-1's website offers to murder individuals in exchange for Bitcoin, the website is a scam, designed to steal money from customers.

18.     As described herein, the FBI has determined that, around the time of the murder for hire, VICTIM's husband, J.M., had been having an extramarital affair with LLUVIA FIGUEROA, a college student whom he met at a self-help course.  When the FBI interviewed FIGUEROA, she admitted that she paid an unknown person, located on the dark web, to kill VICTIM in exchange for $5,000 in bitcoin.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 7
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

19.     As described in further detail below, FIGUEROA used **SUBJECT ACCOUNTS 2** and **3** to register a Facebook account.  FIGUEROA used that Facebook account and **SUBJECT ACCOUNT 1** to communicate with J.M. during the course of the affair.  FIGUEROA also used **SUBJECT ACCOUNT 2** to communicate with financial institutions and the cashier at Grays Harbor College.  These emails may reveal the source of the funds used, including those transferred from J.M. and scholarship funds, to pay SOI-1 to murder VICTIM.

**B.     Anonymous Tip**

20.     On February 12, 2020, a complainant, SOI-1, submitted an online tip to the FBI National Threat Operations Center.  The tip was anonymous, sent from a ProtonMail account, using an IP address associated with a Virtual Private Network ("VPN")[6] in Phoenix, Arizona.  Based on my training and experience, and information gained during the course of this investigation, I know that individuals often use VPNs and encrypted email providers like ProtonMail in order to conceal their identities or physical locations online.

21.     In this tip, SOI-1 claimed to have information regarding a murder for hire. SOI-1 claimed to be the administrator of a "dark web site that offers hitmen for hire," and explained that he/she was contracted to kill VICTIM for approximately $5,000, paid in bitcoin.[7]  SOI-1 claimed the website was set up to scam people out of money, and that no actual murders were committed by SOI-1 or anyone working on SOI-1's behalf.

_____

[6] A VPN connection is a means of connecting to a private network over a public network such as the Internet. A VPN is created by establishing a virtual point-to-point connection through the use of dedicated connections, virtual tunneling protocols, or traffic encryption. VPNs are also frequently used by people who wish to circumvent geographic IP limitations and censorship, and to connect to proxy servers for the purpose of obfuscating the source of an internet connection or transmission.

[7] SOI-1 also informed the FBI about a second murder that had been solicited on SOI-1's website unrelated to the VICTIM identified in this Affidavit.  The FBI is also investigating that potential hit.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 8
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

22.     SOI-1 explained that he/she was concerned about receiving the request to murder VICTIM, thinking that if someone was willing to pay SOI-1, that person may find other means to kill VICTIM.  SOI-1 wanted to work with the FBI and police to track down the individual who had solicited the murder.  SOI-1 stated "I feel that all targets that have been paid for are in danger.  Customers that pay to kill someone show that they are serious about killing that person[.]  I need to be in contact with you and to provide you with the target information, payments evidence, and other information to trace the customers.  Customers don't give their name or details and hide their IP, but still can be tracked."  SOI-1 provided information related to VICTIM and another contract, and said he/she would be willing to provide more details on additional targets.

23.     SOI-1 said that when he/she had received a request to murder VICTIM, the solicitor of this murder (hereinafter referred to as the "solicitor") provided SOI-1 with VICTIM's address in Bellevue, Washington, the name of her employer, the city where she was employed, the age of her son, her routine regarding child care, and the time she returns home.  The solicitor told SOI-1:

> Just kill her ASAP.  I don't care how just make sure she's dead.  I'd prefer if you shoot her in the head.  She works in [corporation][8] in Bellevue but I don't know where exactly.  I don't know if that helps you in someway.  She has a 3 years old son that she picks him up at 5 P.M. so she usually gets home around 5ish.  Please don't do anything to the boy.  That's all. Thanks[.]  Send me a proof when the job's done.

24.     SOI-1 also provided a picture of VICTIM, which an FBI Special Agent Caryn Highley recognized as VICTIM, having met her in person. Additionally, SOI-1 provided the Bitcoin wallet address used for the transaction, which Agent Highley confirmed on the publicly accessible blockchain received approximately .53 bitcoin on February 4, 2020.  Based on the value of Bitcoin on

---

[8] This information is redacted to protect VICTIM's privacy and safety.  However, I have determined that the corporation listed as VICTIM's employer is, in fact, accurate.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  that particular date, this amount is roughly equivalent to the amount that SOI-1

2  claimed he/she was paid by the solicitor—$5,000.

3  **C.    Interview of VICTIM**

4         25.    On February 13, 2020, Agent Highley, along with others, interviewed

5  VICTIM and advised her of the solicitation of her murder.  In order to identify who might

6  have wanted to have VICTIM killed, law enforcement asked VICTIM to identify those

7  who might have wished her harm.

8         26.    VICTIM explained that, in 2010, her husband, J.M., was involved in a

9  sexual harassment lawsuit.  J.M. alleged that a former employer had harassed him, which

10  led to J.M. leaving his company and suing his former boss.  VICTIM felt that it was

11  unlikely that J.M.'s former employer would solicit her murder, but said it was possible

12  due to the "life altering" nature of the situation.

13         27.    VICTIM explained that her husband, J.M., was involved in another lawsuit

14  after he left his former employer in October 2019 to form a business.  After starting this

15  business, J.M.'s former employer sued J.M. for violation of a non-compete clause.  The

16  lawsuit remains ongoing and, in November or December 2019, VICTIM paid their

17  lawyers $5,000 for legal services from a joint account held by J.M. and VICTIM.

18  Recently, a second payment of $5,000 had been withdrawn from her husband's business

19  account.  VICTIM's husband had informed her that this second payment had been made

20  to their lawyers, since she did not have access to her husband's business account.

21         28.    VICTIM also stated that, on December 23, 2019, an unknown female rang

22  VICTIM's front doorbell and asked for J.M. by name.  VICTIM's Ring camera captured

23  the interaction.  When VICTIM told the female that J.M. was not home, the female said

24  she was there to see VICTIM and asked to come into the house.  VICTIM became

25  concerned because the female kept reaching into her pockets.  The female's behavior and

26  her desire to enter the residence prompted VICTIM to lock the deadbolt while talking to

27  the unknown female through the door.  J.M. was not home, but utilizing the Ring camera,

28  he joined the conversation.  Shortly afterward, the female walked away.  VICTIM called

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 10
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    911 and reported the incident to Bellevue Police Department.  She also provided a copy

2    of the video to Bellevue Police Department.  VICTIM still had the video footage

3    available.  Agent Highley reviewed that video and, due to the image quality, cannot

4    conclusively say the female is FIGUEROA, however, based on the complexion, stature,

5    and voice, the woman in the image appears to resemble FIGUEROA.[9]  At the time,

6    VICTIM did not believe the female knew them.  The female asked for J.M. by name, but

7    there was a package outside the residence, next to the front door that was from a family

8    member.  The package had J.M.'s full name visible on it, printed in large letters.  When

9    the female claimed to be there to see VICTIM, she referred to VICTIM as "you" and

10   never referred to her by name.

11        29.    VICTIM also explained that, at the end of January 2020, her employer

12   prematurely ended a contract with a Phoenix-based company.  The contract concluded

13   due to work performance issues with this company.  VICTIM communicated with an

14   employee of this company, B.O., regularly.  According to VICTIM, B.O. is familiar with

15   VICTIM's daily routine, including the time she leaves work to pick up her son.  On one

16   occasion, B.O. traveled to Bellevue, Washington, for two weeks to work at VICTIM's

17   employer's office.  B.O. and VICTIM had several arguments due to criticism of B.O.'s

18   work performance by VICTIM and her supervisor.  B.O. has never threatened VICTIM

19   or any other employees.  Despite their turbulent relationship, VICTIM stated she would

20   be surprised if B.O. had tried to harm her.  VICTIM last spoke to B.O. on February 12,

21   2020.  She said it was difficult to get a hold of B.O., and when she was finally able to

22   contact B.O. on the 12th, B.O. was evasive and quickly ended the phone call.

23        30.    When asked about her relationship with her husband, J.M., VICTIM said it

24   had been strained for the last few years.  She described it as a "loss of passion" and in

25   2018, VICTIM said her husband asked her for a divorce.  She described their relationship

26

27

28   [9] As explained below, J.M. later explained that he recognized this person to be FIGUEROA and
     FIGUEROA admitted, during a proffer interview, that she was the person on camera.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   as growing distant, turning into more of a friendship than a marriage.  She said this began

2   after her husband went to a Landmark conference.  She described the conference as a

3   self-help group designed to help people reassess their lives and make drastic changes.

4   When her husband brought up divorce, VICTIM told her husband that she didn't want to

5   get a divorce.  She wanted to remain a family for the sake of their son.  She convinced

6   her husband to participate in counseling.  However, due to J.M.'s work schedule, he was

7   unable to attend in-person counseling but agreed to an online counseling program.

8   VICTIM stated she had not had an extramarital affair and did not believe her husband

9   had either.

10      31.    VICTIM described her and J.M.'s financial situation as strained, due to the

11   new business and the current lawsuit.  She described their financial situation as month-to-

12   month.  VICTIM stated that she and J.M. each have a $1.5 million life insurance policy.

13   In December 2019, J.M. began asking her to increase their life insurance policies by five

14   hundred thousand dollars each.  VICTIM did not want to meet with an insurance

15   salesman but J.M. continued to bring it up.

16   **D.    Interview with J.M.**

17      32.    On February 13, 2020, Agent Highley, along with others, interviewed J.M.

18   When informed about the threat, he discussed the current lawsuit involving the non-

19   compete clause.  However, he stated it was unlikely that his prior employer would make

20   threats against him or his wife.  When discussing the details contained in the threat,

21   provided by SOI-1, he said the timeframe listed for VICTIM coming home was incorrect,

22   as VICTIM usually comes home at a later time of night.

23      33.    J.M. asked about VICTIM's work with the Phoenix-based company, noting

24   that "they would be closing that team."  He explained that VICTIM had issues with the

25   manager of the Phoenix team (believed to be B.O.) and described the Phoenix manager as

26   "snippy" and "aggressive."

27      34.    When describing his job, J.M. stated that he has "great relationships with

28   people at work," his clients "love" him, he "just had a big win" earlier in the day, and

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 12
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  does not believe he makes enemies.  He stated the "only major points of serious

2  contention are that lawsuit against me and that thing out in Phoenix."

3      35.     When asked if anything unusual had occurred recently, J.M. described the

4  incident from December 23, 2019.  VICTIM notified him that someone was at the door

5  asking for him and said that an unknown female asked to enter the residence.  He

6  confronted the female through the Ring camera, and was able to pull up video to see what

7  she looked like.  J.M. said the female appeared to be older and seemed to be hiding her

8  face.  He was unsure of the date but he believed it was after Christmas.  The unknown

9  female named him, but not his wife.  There was a package outside of the residence that he

10 described as having his name on it, written in large font.  The unknown female reminded

11 him of an employee at his former job—the employer involved in the non-compete

12 lawsuit—but said that this employee had been living in Pennsylvania for the last two

13 years.  He did not recognize her voice, he described it as having an accent, was unsure of

14 the region, and only described it as an "American" accent.[10]  The only other unusual

15 event he could recall was an attempted "break-in" at their residence approximately two

16 years ago.

17     36.     When asked about the possibility of the suspect being someone he had a

18 relationship with, J.M. discussed the Landmark personal development course.  J.M.

19 explained that he first took a course in 2018, attended a second course in 2019, and began

20 attending the third course near the end of 2019.  Due to the length of the third course, he

21 dropped out at the request of his wife because there was too much going on at home.

22 J.M. stated that he provided personal information in group discussions, but never

23 discussed information regarding his or his wife's schedule.  He said he discussed issues

24 about his marriage with people in the group, but also indicated he wanted to repair the

25 marriage.  J.M. said he shared the information regarding his wife with a woman, but he

26

27 _____

28 [10] As described below, J.M. later recanted this explanation and told the FBI that he knew this woman was
FIGUEROA.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 13
USAO# 2020R00187

could not remember who she was.  J.M. said he couldn't imagine that she would "instigate" the current situation.  He stated that he didn't have any "follows" or anyone he described as a "secret valentines in there or anything.  You know what I mean?  That I knew."

37.     During the interview, J.M. initially denied having an extramarital affair.  As the conversation continued, J.M. said there was "someone" at the Landmark program that "really liked" him.  He stated her name was LLUVIA.  When asked for her last name, J.M. accessed his cell phone, and he stated he last had contact with her on January 25, 2020, when she sent him a paper for him "to correct for school."  J.M. explained that LLUVIA is a student somewhere in South Bend, studying immigration law.  Later during the interview, J.M. accessed LLUVIA FIGUEROA's Facebook account and mentioned that she was attending school at Grays Harbor College.  He claimed the last time FIGUEROA had been in his house was June 2019.

38.     As the conversation continued, J.M. admitted to having a sexual relationship with FIGUEROA that lasted approximately "six months or so, a couple times, here and there."  According to J.M., the relationship started as a friendship in 2018 when they met at the Landmark course and later became romantic.  He claimed the romantic relationship ended in August 2019.  J.M. said he last saw FIGUEROA in January of 2020, when she told him she still loved him.

39.     J.M. explained that, while he knew FIGUEROA, he provided her with money on multiple occasions to "help her out."  Most recently, on January 3, 2020, FIGUEROA asked J.M. for $5,000.  J.M. said that he didn't have that amount of money and instead gave her $2,000.  FIGUEROA said that the money was to help her parents because they were victims of a break-in and lost their life savings.  While all of the previous payments were sent through Facebook, the $2,000 payment was made through J.M.'s PayPal account.

40.     When the situation in Phoenix was brought up again, J.M. stated, "No, I don't think that, I mean, if anything it's this [his relationship with FIGUEROA], this is

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 14
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   much more probabl[e] than that." When asked why he felt that way, J.M. stated it was

2   because, "[FIGUEROA] likes me and I said, I'm not gonna do that anymore…"

3   However, J.M. clarified that FIGUEROA gave him no indication of being a threat.

4   **E.      Interview of FIGUEROA**

5          41.      On February 14, 2020, FBI Special Agent Schroff interviewed LLUVIA

6   FIGUEROA[11] at her place of employment in Aberdeen, Washington. Prior to the

7   interview, Agent Schroff identified himself with his FBI credentials and asked

8   FIGUEROA if she would be willing to speak with him in a private place. Agent Schroff

9   informed FIGUEROA that she wasn't in trouble but may be a witness. FIGUEROA

10  agreed and suggested the two meet outside as there were no quiet semi-private areas

11  inside the business. Due to the temperature outside, Agent Schroff suggested the two

12  speak in his vehicle and asked FIGUEROA if she would be comfortable with that.

13  FIGUEROA agreed and the two spoke in the vehicle, with FIGUEROA sitting in the

14  passenger seat of the unlocked car. Towards the end of the interview, Agent Schroff

15  explicitly told FIGUEROA that she was not under arrest and would be going back to

16  work that night.

17         42.      FIGUEROA told Agent Schroff that she participated in the Landmark

18  program, along with her brother, and met J.M. there. They became friends, and their

19  friendship evolved into a sexual relationship that has continued. FIGUEROA said that

20  she had been in J.M.'s house five to seven times, including once with her brother.

21  FIGUEROA explained that she last saw J.M. approximately three weeks ago when they

22  went to Portland, Oregon, where they spent the night.

23         43.      FIGUEROA claimed that, at first, she was unaware that J.M. was married.

24  When she found out, J.M. told FIGUEROA that his wife had cancer and that he talked to

25  his wife about divorce but decided to stay with her due to her illness. FIGUEROA stated

26

27  _____

28  [11] This interview was recorded surreptitiously.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 15
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   the situation made her angry.  FIGUEROA initially denied hiring someone to hurt J.M.'s

2   wife.

3          44.    Agent Schroff asked FIGUEROA for further details about J.M.

4   FIGUEROA explained that, even though she knew J.M. for approximately two years, she

5   did not believe she knew him completely.  When asked why she felt that way,

6   FIGUEROA stated that J.M. would say things that were not accurate.  For example,

7   FIGUEROA said that J.M. told her that his wife was sick, and that he could not stand his

8   wife.  However, FIGUEROA observed photos online of J.M. and his wife that appeared

9   to contradict those statements.  Additionally, when J.M. and FIGUEROA went to Oregon

10  together, J.M. told FIGUEROA that his wife went to Malaysia to get surgery.

11  FIGUEROA learned that VICTIM took her son with her to Malaysia, and FIGUEROA

12  thought that a sick woman would likely not travel internationally with a child.

13  FIGUEROA believed that J.M.'s son was approximately two or three years old.

14  FIGUEROA knew the three-year-old went to school in Bellevue, Washington, but she did

15  not know where.

16         45.    FIGUEROA said that in November or December 2019, she "tried to send

17  [VICTIM] some images" on Facebook "about [the relationship between J.M.] and I."

18  FIGUEROA also said that, several years ago, she and her friend created a fake Facebook

19  account but claimed that she hadn't done so recently.

20         46.    Although earlier in the interview FIGUEROA repeatedly denied trying to

21  murder VICTIM, as the conversation continued, FIGUEROA admitted that she solicited

22  the murder.  FIGUEROA explained that "[t]he person that did that, it was me, I don't

23  know this would help right now or not, but I tried to delete it, but I couldn't do it…"

24  FIGUEROA said that she had used an "old phone" to solicit the hit, downloading an

25  application on her phone to hide her identity.  Based on my training and experience, and

26  information conveyed by FIGUEROA, I believe this application is a Tor browser, used to

27  access the dark web.  FIGUEROA explained that she purchased the services of an

28  unknown individual to kill VICTIM, and paid for those services with $5,000 in bitcoin.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 16
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

FIGUEROA had previously explained that she was familiar with Bitcoin because she used it to purchase clothes from another country.  FIGUEROA explained that there was an option on the website, where she had solicited the hit, to "delete" the transaction, but she was unable to do so because she could no longer access the website on her phone.

47.     FIGUEROA believed there was a "fifteen-fifty" chance that the website offering hitman services was a scam.  When asked how FIGUEROA felt about VICTIM being killed, she stated she was nervous.  When asked if she hoping J.M. would come live with her once his wife was killed, FIGUEROA said "…yeah."  FIGUEROA denied that J.M. was involved in the plan to murder his wife.  FIGUEROA said the phone she used to solicit the murder was currently at her home, in her bedroom in South Bend, Washington.  She stated that she deleted her browser history on the phone and had not discussed the incident with anyone else.

48.     On February 21, 2020, Agent Schroff and I tried to interview FIGUEROA again but she invoked her right to counsel and declined to be interviewed.  As described herein, FIGUEROA later participated in a proffer interview on March 17, 2020.

**F.     VICTIM's Facebook Account**

49.     I have reviewed VICTIM's Facebook account, with her consent, and located messages sent from an account held in the name of Katlyn Everson.  When viewing this account publicly, neither a profile picture nor a cover photo are shown for Katyln Everson.  It appeared that VICTIM had not yet accessed or opened these messages at the time that I viewed them.

50.     On December 17, 2019, the Everson account sent VICTIM a series of messages.  First, the Everson account sent VICTIM a photograph of J.M., followed by a message that stated "I know it's none of my business but [J.M] Im guessing your husband is cheating on u.  I know it because I know the person he's cheating on u with.  If u dont believe me, they're gonna meet up today at the Kizuki Ramen restaurant in Olympia at 4:30 PM.  You can prove it by yourself."

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 17
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

51.     On January 2, 2020, the Everson account sent VICTIM a series of pictures, which appear to show J.M. kissing and sitting next to FIGUEROA, taken by what appears to be a third party at a neighboring table in the restaurant.

52.     I showed VICTIM a copy of the photograph provided to SOI-1, when the individual solicited VICTIM's murder.  VICTIM confirmed that this photograph is publicly accessible on VICTIM's Facebook page.

**G.     Follow-Up Interview of J.M.**

53.     March 3, 2020, I interviewed J.M.  During this interview, I again asked him about the Ring camera video, taken on December 23, 2019, when an unknown female rang VICTIM's front doorbell and asked for J.M. by name.  J.M. admitted that he knew the woman in the video was FIGUEROA and that he had previously lied to investigators when he denied recognizing the individual in the video.  J.M. stated that, after this video was taken, he talked to FIGUEROA and asked her why she had gone to his home.  FIGUEROA told J.M. that she was there to kill VICTIM and that she brought a knife with her in order to accomplish the murder.

54.     J.M. said that he had omitted this information from his prior interview because he was concerned his wife would find out about the affair.  J.M made the following statement regarding the time frame of his relationship with FIGUEROA, which he did not disclose to law enforcement during his first interview.  J.M started a friendship with FIGUEROA and her brother in August of 2018.  J.M. stated that the relationship evolved into a sexual relationship in the beginning of 2019.  J.M. said he ended the romantic relationship with FIGUEROA in the summer of 2019 but maintained a friendship with her.  J.M. stated that the relationship became romantic again in December of 2019. J.M. stated that, the last time he saw FIGUEROA was on January 28, 2020, when they met for dinner.

**H.     FIGUEROA Proffer Interview**

55.     On March 17, 2020, I, along with others, interviewed FIGUEROA pursuant to a proffer agreement, in the presence of her counsel.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 18
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

56.     During this proffer interview FIGUEROA confirmed that she had solicited VICTIM's murder.  FIGUEROA explained that she had been having an affair with VICTIM's husband, J.M., since approximately the summer of 2018.  FIGUEROA explained that their relationship ebbed and flowed, with FIGUEROA ending the relationship at multiple points after FIGUEROA became frustrated that J.M. would not leave his wife.

57.     FIGUEROA explained that J.M. offered several excuses for why he would not leave his wife, including that his wife had cancer, he was afraid that he would lose custody of his child in a divorce, and that his wife had tried to take her life when he previously threatened her with divorce.  FIGUEROA claimed that J.M. told her that they could not be together until his wife died or something happened.

58.     FIGUEROA stated that she and J.M. rekindled their romance for the final time in the fall of 2019.  After returning to her relationship with J.M., FIGUEROA took several steps to try to end J.M. and VICTIM's marriage.

59.     First, FIGUEROA tried to send VICTIM pictures of herself and J.M. being intimate at a restaurant.  To do this, FIGUEROA set up a fake Facebook account and sent pictures to VICTIM.  These pictures were taken by FIGUEROA's cousin, who was seated at a nearby table when J.M. and FIGUEROA were having dinner.  FIGUEROA asked her cousin to take these photographs so she could send them to VICTIM.  After sending these photographs, FIGUEROA received no response from VICTIM.

60.     FIGUEROA then escalated her behavior, deciding to go to VICTIM's home to tell her in person about the affair.  FIGUEROA and J.M. made plans to meet for dinner at a restaurant in Olympia.  Knowing that J.M. would be on his way to the restaurant, FIGUEROA went to VICTIM's house and told VICTIM that she was looking for J.M.  When VICTIM said that J.M. was not home, FIGUEROA explained that she had something to tell VICTIM.  At that point, J.M. started speaking to FIGUEROA using the Ring camera connected to VICTIM's home and FIGUEROA decided to leave.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 19
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

61.     FIGUEROA explained that, after leaving the house, FIGUEROA met J.M. for dinner.  J.M. asked why FIGUEROA went to his home, and FIGUEROA told him that she went there to kill VICTIM.  FIGUEROA stated that she did not really intend to kill VICTIM, and was not armed when she went to the home, but told J.M. this because she was upset.  FIGUEROA claimed that J.M. wasn't angry but instead saw the behavior as a sign of her dedication and affection for him.

62.     FIGUEROA claimed that, in the past, J.M. had made comments about wanting to kill his wife and once asked FIGUEROA if she knew anyone who would kill his wife.

63.     FIGUEROA confirmed that J.M. had previously sent her money using Facebook messenger and recently sent her $2,000 using PayPal.  FIGUEROA explained that she used this $2,000, along with money she had saved from her college scholarship, to solicit VICTIM's murder.  FIGUEROA said that J.M. did not know that she planned on hiring a hitman on the dark web, but believed that J.M. would be pleased if he found out that she had.

64.     FIGUEROA stated that, to solicit the murder, she used her old phone, a phone that she had obtained from her pastor that was not linked to her.  She then googled the dark web, downloaded an application to access the dark web, and located several sites offering hitmen services.  FIGUEROA studied those sites, reviewing comments and requesting information on pricing, before selecting her hitman.  FIGUEROA explained that these sites offered a multitude of services, offering to beat, maim, or kill victims, to be carried out by hitmen with a range of experience levels.  She selected SOI-1's site because it had an escrow system, giving her a sense of security that her funds would not be stolen.  FIGUEROA explained that, to solicit the hit, she sent a message to SOI-1 on this website, sending SOI-1 VICTIM's Facebook profile picture, VICTIM's name and address, requesting that SOI-1 shoot VICTIM in the head, telling SOI-1 that she would release the funds from escrow once she had a picture of the VICTIM murdered, and asking SOI-1 not to harm VICTIM's child.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

65.     To obtain the $5,000 in bitcoin necessary to pay for the hit, FIGUEROA explained that she went to a number of websites that offered bitcoin wallet services. FIGUEROA used fake names and email addresses on these websites.  FIGUEROA said that she went to multiple websites, stopping after each site asked her for identifying information or a copy of her driver's license.  Finally, she found a website that didn't ask her for any identifying information, and FIGUEROA opened a wallet on that site using a fake email address that began with the name Nicole, believed by law enforcement to be nicolestigall22@outlook.com.

66.     To purchase the bitcoin, FIGUEROA went to a bitcoin ATM, located outside a gas station in Olympia, Washington.  After FIGUEROA put cash into this ATM and scanned her wallet address, bitcoin was transferred to her wallet.  FIGUEROA went to this ATM twice in order to obtain enough bitcoin to pay for the hit.  FIGUEROA then transferred this bitcoin to a wallet address provided by SOI-1.

67.     After paying these funds, FIGUEROA claimed that weeks went by and SOI-1 had still not murdered VICTIM.  FIGUEROA went back to SOI-1's website and asked him/her about the delay.  SOI-1 told FIGUEROA that the hitman who had been hired was arrested and they were going to staff another hitman to complete the hit.

68.     In addition to contacting SOI-1, FIGUEROA explained that she also contacted a second hitman, communicating with this hitman via email.  FIGUEROA sent that hitman VICTIM's photograph and address but declined to use that hitman's services because he/she was more expensive and less reliable than SOI-1.

I.      THE SUBJECT ACCOUNTS

69.     While they were having an affair, FIGUEROA and J.M. communicated using **SUBJECT ACCOUNT 1.**

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 21
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      a.      For example, on October 9, 2018, J.M. emailed FIGUEROA, using

2  the email address lfigueroa@my.ghc.edu (**SUBJECT ACCOUNT 1**).[12]

3      b.      Additionally, on November 23, 2019, lfigueroa@my.ghc.edu

4  (**SUBJECT ACCOUNT 1**) sent an email to J.M.

5      70.      During the time period of the affair, J.M. and FIGUEROA also used

6  Facebook to communicate and so that J.M. could send money to FIGUEROA.

7      a.      FIGUEROA used the account lluviaselene.sierrafigueroa.

8  According to Facebook, this account was registered in the name of LLUVIA

9  FIGUEROA on May 23, 2011.

10      b.      From September 2018 through August 2019, FIGUEROA,

11  used this Facebook account to exchange messages with J.M.  FIGUEROA also

12  had payment information registered to their accounts.

13      c.      **SUBJECT ACCOUNTS 2** and **3** are listed as two of three

14  registered email addresses associated with FIGUEROA's Facebook account.

15      d.      Based on my training and experience, I know that if an

16  individual sends a Facebook message—a private direct message only visible to the

17  Facebook sender and recipient—Facebook will often email the recipient

18  notifications when the user has received a message.  This includes notifications

19  that a Facebook user has received a payment using Facebook Messenger

20  payments.  Additionally, Facebook will notify user if they have been tagged on

21  another's page or mentioned in another's post.  These notifications can include the

22  substance of another's tag or Facebook post.  **SUBJECT ACCOUNTS 2** and **3**

23  would have received these kinds of communications from Facebook.

24

25

26

27  [12] FIGUEROA is a student at Grays Harbor College.  As described herein, this account is serviced by Microsoft.
Law enforcement previously obtained a warrant to obtain this information from Microsoft but Microsoft requested

28  that we gather the emails directly from Grays Harbor College.  Accordingly, I seek this additional warrant to obtain
information related to this account from Grays Harbor College.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 22
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

e.     For example, on April 3, 2020, **SUBJECT ACCOUNT 2** received a message from "The Messenger Team" at notification@facebookmail.com.  Additionally, on October 11, 2019, **SUBJECT ACCOUNT 2** received a message from "Facebook" at notification@facebookmail.com.

71.    FIGUEROA also obtained emails from financial institutions at **SUBJECT ACCOUNT 2**.  These emails may help identify FIGUEROA's assets, the location of her accounts, and receipt of funds from J.M. or other sources, used to pay SOI-1.

a.     For example, on December 28, 2019 and January 21, 2020, **SUBJECT ACCOUNT 2** received emails from operations@ssbwa.com, affiliated with Security State Bank.

b.     Additionally, during her proffer, FIGUEROA stated that she used a portion of her academic scholarship to pay the remaining $5,000 to SOI-1. **SUBJECT ACCOUNT 2** also contains emails from Grays Harbor College, including an email on November 22, 2019 from cashier@ghc.edu.

72.    In order to gather information related to FIGUEROA's efforts to solicit VICTIM's murder, including evidence that FIGUEROA was having an affair with J.M., FIGUEROA accepted money from J.M., and FIGUEROA used this money along with her scholarship funds to solicit VICTIM's murder, I request authorization to search the **SUBJECT ACCOUNTS**.

## BACKGROUND CONCERNING ONLINE ACCOUNTS

73.    As explained herein, information stored in connection with an online account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

74.    In my training and experience, the information stored in connection with an online account can indicate who has used or controlled the account.  This "user

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 23
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  attribution" evidence is analogous to the search for "indicia of occupancy" while

2  executing a search warrant at a residence.  For example, email communications, contacts

3  lists, and images sent (and the data associated with the foregoing, such as date and time)

4  may indicate who used or controlled the account at a relevant time.

5       75.  Further, information maintained by the email provider can show how and

6  when the account was accessed or used.  For example, as described below, email

7  providers typically log the Internet Protocol (IP) addresses from which users access the

8  email account, along with the time and date of that access.  By determining the physical

9  location associated with the logged IP addresses, investigators can understand the

10  chronological and geographic context of the email account access and use relating to the

11  crime under investigation.  This geographic and timeline information may tend to either

12  inculpate or exculpate the account owner.  Additionally, information stored at the user's

13  account may further indicate the geographic location of the account user at a particular

14  time (e.g., location information integrated into an image or video sent via email).

15       76.  Stored electronic data may provide relevant insight into the email account

16  owner's state of mind as it relates to the offense under investigation.  For example,

17  information in the email account may indicate the owner's motive and intent to commit a

18  crime (e.g., communications relating to the crime), or consciousness of guilt (e.g.,

19  deleting communications in an effort to conceal them from law enforcement).

20       **1.  Microsoft's and Grays Harbor College's Services**

21       77.  In my training and experience, I have learned that Microsoft provides a

22  variety of online services, including electronic mail ("email") access and instant

23  messaging (otherwise known as "chat" messaging), to the general public.  Microsoft

24  provides subscribers email and chat accounts at the domain name "@hotmail.com."

25       78.  According to online databases, Microsoft services the domain @

26  my.ghc.edu, on behalf of Grays Harbor College.   Grays Harbor College also keeps

27  copies of these records.

28

**A. Subscriber Records and Account Content**

79.     Subscribers obtain an account by registering with Microsoft.  When doing so, email providers like Microsoft ask the subscriber to provide certain personal identifying information.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users, and to help establish who has dominion and control over the account.

80.     Email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Microsoft's websites), and other log files that reflect usage of the account.  In addition, email providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

81.     In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 25
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  evidence of the crimes under investigation because the information can be used to

2  identify the account's user or users.

3      82.      In general, an email that is sent to a Microsoft subscriber is stored in the

4  subscriber's "mail box" on Microsoft's servers until the subscriber deletes the email.

5  When the subscriber sends an email, it is initiated at the user's computer, transferred via

6  the Internet to Microsoft servers, and then transmitted to its end destination.  Microsoft

7  often maintains a copy of received and sent emails.  Unless the sender specifically deletes

8  an email from the Microsoft server, the email can remain on the system indefinitely.

9  Even if the subscriber deletes the email, it may continue to be available on Microsoft's

10  servers for some period of time.

11      83.      A sent or received email typically includes the content of the message,

12  source and destination addresses, the date and time at which the email was sent, and the

13  size and length of the email.  If an email user writes a draft message but does not send it,

14  that message may also be saved by Microsoft but may not include all of these categories

15  of data.

16      84.      In my training and experience email providers like Microsoft typically

17  retain certain transactional information about the creation and use of each account on

18  their systems.  This information can include the date on which the account was created,

19  the length of service, records of log-in (*i.e.*, session) times and durations, the types of

20  service utilized, the status of the account (including whether the account is inactive or

21  closed), the methods used to connect to the account (such as logging into the account via

22  a website), and other log files that reflect usage of the account.  In addition, email

23  providers often have records of the IP address used to register the account and the IP

24  addresses associated with particular logins to the account.  Because every device that

25  connects to the Internet must use an IP address, IP address information can help to

26  identify which computers or other devices were used to access the email account, which

27  can help establish the individual or individuals who had dominion and control over the

28  account

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

85.     In general, an email that is sent to a Microsoft subscriber is stored in the subscriber's "mail box" on Microsoft's servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Microsoft's servers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Microsoft's servers for a certain period of time.

86.     When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to Microsoft's servers, and then transmitted to its end destination.  Microsoft often maintains a copy of the email sent.  Unless the sender of the email specifically deletes the email from Microsoft's server, the email can remain on the system indefinitely.  Even if the sender deletes the email, it may continue to be available on Microsoft's servers for a certain period of time.

87.     A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email.  If an email user writes a draft message but does not send it, that message may also be saved by Microsoft but may not include all of these categories of data.

88.     Microsoft provides a variety of online, or "cloud," services in addition to email access, to the public and to customers who utilize Hotmail accounts that are served by Microsoft.  Microsoft's various cloud services are associated with a single Microsoft account, which is typically associated with a Microsoft email address, but can be associated with any email address.  The various cloud services provided by Microsoft are optional and can be turned "on" or "off" by the user.

89.     In providing services such as Outlook, OneDrive, Xbox, calendar services, online file storage, storage of browsing history, storage of search history, and locations history, Microsoft collects information that constitute evidence of the crimes under investigation.  For example, such evidence can be used to discover or confirm the identity and location users of the service at a particular time.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 27
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

90.     Pursuant to Title 18, United States Code, Section 2703(g), this application and affidavit for a search warrant seeks authorization to require **THE PROVIDERS**, and their agents and employees, to assist agents in the execution of this warrant.  Once issued, the search warrant will be presented to **THE PROVIDERS** with direction that they identify the accounts described in Attachments A-1 and A-2 to this affidavit, as well as other subscriber and log records associated with the accounts, as set forth in Section I of Attachments B-1 and B-2 to this affidavit.

91.     The search warrant will direct **THE PROVIDERS** to create an exact copy of the specified account and records.

92.     I, and/or other law enforcement personnel will thereafter review the copy of the electronically stored data and identify from among that content those items that come within the items identified in Section II to Attachments B-1 and B-2 for seizure.

93.     Analyzing the data contained in the forensic copy may require special technical skills, equipment, and software.  It could also be very time-consuming. Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process. Keywords used originally need to be modified continuously, based on interim results. Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common email, database and spreadsheet applications do not store data as searchable text.  The data may be saved, instead, in proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well.   Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  All forensic analysis of the data will employ only those search protocols and

methodologies reasonably designed to identify and seize the items identified in Section II of Attachments B-1 and B-2 to the warrant.

94. Based on my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize a variety of e-mail communications, chat logs and documents, that identify any users of the subject account and e-mails sent or received in temporal proximity to incriminating e-mails that provide context to the incriminating communications.

## CONCLUSION

95. Based on the forgoing, I respectfully request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Additionally, the Court "is in . . . a district in which the provider . . . is located or in which the wire or electronic communications, records, or other information are stored." 18 U.S.C. § 2711(3)(A)(ii). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 29
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

96.     Accordingly, by this Affidavit and Warrant I seek authority for the government to search all of the items specified in Section I, Attachments B-1 and B-2 (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

Allana Kleinosky, Affiant
Special Agent

The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit on the 23 day of April, 2020.

HONORABLE BRIAN A. TSUCHIDA
United States Magistrate Judge

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 30
USAO# 2020R00187

## ATTACHMENT A-1

### Grays Harbor College Accounts to be Searched

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with Grays Harbor College account:

**lfigueroa@my.ghc.edu**

(the "Account") that are stored at a premises controlled by Grays Harbor College, a school that accepts service of legal process at 1620 Edward P. Smith Drive in Aberdeen, Washington.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 31
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B-1**

**Particular Things to be Seized**

**I. Information to be disclosed by Grays Harbor College:**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Grays Harbor College, including any data, messages, records, files, logs, or information that has been deleted but is still available to Grays Harbor College, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Grays Harbor College is required to disclose the following information to the government for each Account or identifier listed in Attachment A-1, from June 1, 2018 to the present:

   a. All electronic mail content and/or preserved data (including email, attachments, and embedded files);

   b. All subscriber records associated with the specified account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by Google in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

   c. all contact lists;

   d. all account history, including any records of communications between Grays Harbor College and any other person about issues relating to the accounts, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber in connection with the service.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 32
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Grays Harbor College is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

**II.**   **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code, Section 1958 (Murder for Hire), those violations occurring between June 2018 and the present, for each of the Accounts listed on Attachment A-1, including the following:

a.   any information related to J.M.'s relationship with FIGUEROA, including communications between the two, plans to meet, and photographs of FIGUEROA and J.M.;

b.   any information related to romantic feelings between J.M. and FIGUEROA, desire to remain a couple, or desire to break up or end their affair;

c.   any information related to FIGUEROA's desire to have J.M. end his marriage or to marry or solely be romantically involved with FIGUEROA.

d.   any information related to J.M.'s relationship with VICTIM, including communications regarding divorce, separation, or illness, or evidence that J.M. was unhappy in his marriage or sough to murder VICTIM;

e.   any information related to a plan to solicit murder, including by accessing websites or contacting individuals to solicit murder;

f.   any information related to J.M.'s or FIGUEROA's attendance at a Landmark course or FIGUEROA's attempts to visit or actual visits to VICTIM's house;

g.   any information related to payments made by J.M. to FIGUEROA;

h.   any information related to FIGUEROA's transfer, purchase, sale, or disposition of Bitcoin or other cryptocurrency;

i.   any information related to J.M.'s or FIGUEROA's assets, including their bank records, checks, credit card bills, account information, scholarship funds, and other financial records, to include life insurance policies.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 33
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      j.      any information related to use of the dark web, including use or

2  downloading of a Tor browser;

3      k.      any information related to J.M.'s statements to FIGUEROA

4  regarding VICTIM;

5      l.      any information related to efforts to delete browsing history or

6  undertake other acts to remain anonymous online, including by accessing VPNs or

7  creating multiple email accounts in a short time frame;

8      m.      any information related to the creation of a fake Facebook account to

9  contact VICTIM or fake email accounts to use in furtherance of the solicitation for

10  murder;

11      n.      any information related to prior attempts to harm or threaten

12  VICTIM, or to reveal J.M.'s and FIGUEROA's affair;

13      o.      any information consisting of, referring to, or reflecting use of

14  cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and

15  related private encryption keys, seed phrases, or other passwords;

16      p.      any information consisting of, referring to, or reflecting use of

17  encryption or digital signature software, such as PGP encryption, and related public and

18  private encryption keys;

19      q.      any information related to cryptocurrency applications and wallets,

20  to include information regarding current account balance and transaction history, *i.e.*,

21  date, time, amount, an address of the sender/recipient of a cryptocurrency transaction

22  maintained in such wallets;

23      r.      any information reflecting cryptocurrencies, including web history,

24  and documents showing the location, source, and timing of acquisition of any

25  cryptocurrencies, to include wallets, wallet addresses, and seed phrases; and

26      s.      Evidence that serves to identify any person who uses or accesses the

27  Account or who exercises in any way any dominion or control over the Account;

28

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 34
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

t.      Evidence that may identify the aliases names, online user names, "handles" and/or "nics" of those who exercise in any way any dominion or control over the specified Account as well as records or information that may reveal the true identities of these individuals;

u.      Other log records, including IP address captures, associated with the specified Account;

v.      Subscriber records associated with the specified Account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, Including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by internet service provider in relation to the account; 6) account log files (login IP address, account activation IP addresses, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

w.      Records of communications between the internet service provider and any person purporting to be the account holder about issues relating to the Account, such as technical problems, billing inquiries, or complaints from other users about the specified Account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

x.      Information identifying accounts that are linked or associated with the Account.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 35
USAO# 2020R00187

the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 36
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7790

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of _____. The attached records consist of _____ [GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)].  I further state that:

a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____, and they were made by _____ as a regular practice; and

b.    such records were generated by _____'s electronic process or system that produces an accurate result, to wit:

1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

2.    the process or system is regularly verified by _____, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


Date          Signature

## ATTACHMENT A-2

### Microsoft Accounts to be Searched

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with Microsoft accounts:

**prinhces_latina07@hotmail.com**

**lluvia_selene07@hotmail.com**

(the "Accounts") that are stored at a premises controlled by Microsoft Corporation, a company that accepts service of legal process at 1 Microsoft Way in Redmond, Washington.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 38
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## **ATTACHMENT B-2**

### **Particular Things to be Seized**

**I.  Information to be disclosed by Microsoft Corporation:**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of Microsoft Corporation ("Microsoft"), including any data, messages, records, files, logs, or information that has been deleted but is still available to Microsoft, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Microsoft is required to disclose the following information to the government for each account or identifier listed in Attachment A-2, from June 2018 to the present:

a.      All electronic mail content and/or preserved data (including email, attachments, and embedded files);

b.      All subscriber records associated with the specified account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by Microsoft in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

c.      all contact lists;

i.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 39
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   registration, methods of connecting, log files, and means and source of payment

2   (including any credit or bank account number);

3          j.      The types of service utilized;

4          k.      All records or other information stored at any time by an individual using

5   the account, including address books, contact and buddy lists, calendar data, pictures, and

6   files;

7          l.      All account history, including any records of communications between

8   Microsoft and any other person about issues relating to the accounts, such as technical

9   problems, billing inquiries, or complaints from other users about the specified account.

10  This to include records of contacts between the subscriber and the provider's support

11  services, as well as records of any actions taken by the provider or subscriber in

12  connection with the service.

13          Microsoft is hereby ordered to disclose the above information to the government

14  within **14 days** of service of this warrant.

15

16  **II.    Information to be seized by the government**

17          All information described above in Section I that constitutes fruits, contraband,

18  evidence and instrumentalities of violations of Title 18, United States Code, Section 1958

19  (Murder for Hire), those violations occurring between June 2018 and the present, for each

20  of the Accounts listed on Attachment A-2, including the following:

21          a.      any information related to J.M.'s relationship with FIGUEROA,

22  including communications between the two, plans to meet, and photographs of

23  FIGUEROA and J.M. (together or held by or sent to the other);

24          b.      any information related to romantic feelings between J.M. and

25  FIGUEROA, desire to remain a couple, or desire to break up or end their affair;

26          c.      any information related to FIGUEROA's desire to have J.M. end his

27  marriage or to marry or solely be romantically involved with FIGUEROA.

28

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 40
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

d. any information related to J.M.'s relationship with VICTIM, including communications regarding divorce, separation, or illness, or evidence that J.M. was unhappy in his marriage or sough to murder VICTIM;

e. any information related to a plan to solicit murder, including by accessing websites or contacting individuals to solicit murder;

f. any information related to J.M.'s or FIGUEROA's attendance at a Landmark course or FIGUEROA's attempts to visit or actual visits to VICTIM's house;

g. any information related to payments made by J.M. to FIGUEROA;

h. any information related to FIGUEROA's transfer, purchase, sale, or disposition of Bitcoin or other cryptocurrency;

i. any information related to J.M.'s or FIGUEROA's assets, including their bank records, checks, credit card bills, account information, and other financial records, to include life insurance policies.

j. any information related to use of the dark web, including use or downloading of a Tor browser;

k. any information related to J.M.'s statements to FIGUEROA regarding VICTIM;

l. any information related to efforts to delete browsing history or undertake other acts to remain anonymous online, including by accessing VPNs or creating multiple email accounts in a short time frame;

m. any information related to the creation of a fake Facebook account to contact VICTIM or fake email accounts to use in furtherance of the solicitation for murder;

n. any information related to prior attempts to harm or threaten VICTIM, or to reveal J.M.'s and FIGUEROA's affair;

o. any information consisting of, referring to, or reflecting use of cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and related private encryption keys, seed phrases, or other passwords;

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 41
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        p.      any information consisting of, referring to, or reflecting use of
2   encryption or digital signature software, such as PGP encryption, and related public and
3   private encryption keys;

4        q.      any information related to cryptocurrency applications and wallets,
5   to include information regarding current account balance and transaction history, *i.e.*,
6   date, time, amount, an address of the sender/recipient of a cryptocurrency transaction
7   maintained in such wallets;

8        r.      any information reflecting cryptocurrencies, including web history,
9   and documents showing the location, source, and timing of acquisition of any
10  cryptocurrencies, to include wallets, wallet addresses, and seed phrases; and

11       s.      Evidence that serves to identify any person who uses or accesses the
12  Accounts or who exercises in any way any dominion or control over the Accounts;

13       t.      Evidence that may identify the aliases names, online user names,
14  "handles" and/or "nics" of those who exercise in any way any dominion or control over
15  the specified Accounts as well as records or information that may reveal the true
16  identities of these individuals;

17       u.      Other log records, including IP address captures, associated with the
18  specified Accounts;

19       v.      Subscriber records associated with the specified Accounts, including
20  1) names, email addresses, and screen names; 2) physical addresses; 3) records of session
21  times and durations; 4) length of service (including start date) and types of services
22  utilized; 5) telephone or instrument number or other subscriber number or identity,
23  Including any temporarily assigned network address such as IP address, media access
24  card addresses, or any other unique device identifiers recorded by internet service
25  provider in relation to the account; 6) account log files (login IP address, account
26  activation IP addresses, and IP address history); 7) detailed billing records/logs; 8) means
27  and source of payment; and 9) lists of all related accounts;

28

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 42
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

w.     Records of communications between the internet service provider and any person purporting to be the account holder about issues relating to the Accounts, such as technical problems, billing inquiries, or complaints from other users about the specified Accounts.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

x.     Information identifying accounts that are linked or associated with the Accounts.


This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 43
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of _____. The attached records consist of _____ [GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)].  I further state that:

      a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____, and they were made by _____ as a regular practice; and

      b.    such records were generated by _____'s electronic process or system that produces an accurate result, to wit:

    1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

    2.    the process or system is regularly verified by _____, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

Date       Signature

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 44
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970